# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

CHANTAL BASTIAN, *et al.* on behalf of     :
themselves and all others similarly situated,     :
    :
      Plaintiffs,     :   Case No.: 3:13-cv-001454-TJC-MCR
    :
vs.     :
    :
UNITED SERVICES AUTOMOBILE     :
ASSOCIATION, *et al.,*     :
    :
      Defendants.     :

## PLAINTIFFS' MOTION FOR APPROVAL OF ATTORNEYS' FEES AND COSTS AND NAMED PLAINTIFFS' SERVICE AWARDS

Plaintiffs file this Motion for Approval of Attorneys' Fees and Costs and Named Plaintiffs' Service Awards. Pursuant to the settlement, Defendants do not oppose this motion.

## I.  CONCISE STATEMENT OF THE PRECISE RELIEF REQUESTED.

Plaintiffs request that the Court approve attorneys' fees of $5 million and costs of $100,000.00, and service awards of $10,000.00 for Named Plaintiffs Chantal Bastian, William Laker, and Oliver Sutton; and $8,000.00 for Named Plaintiffs Terry Smith and Ryan Love.

## II.  STATEMENT OF THE BASIS FOR THE REQUEST.

Plaintiffs move the Court for approval of attorneys' fees, costs, and service awards pursuant to the Settlement Agreement (129-1, at ¶¶ 84-85) preliminarily approved by the Court. (Doc. 135, Preliminary Approval, at ¶¶ 1, 34).  The requested fees, costs, and service awards were negotiated at arm's length between the parties after all other terms of the settlement were reached.  (Declaration of Christopher B. Hall, at ¶¶ 77, 117).

1

### III.    MEMORANDUM OF LEGAL AUTHORITY.

The fees sought by Plaintiffs and class counsel Hall & Lampros, LLP ("Hall & Lampros") and Avolio & Hanlon PC ("Avolio & Hanlon") (together "Class Counsel") were reached pursuant to arm's length negotiations, were agreed by Defendants as part of the Class Action Settlement, and are reasonable under the "percentage of the benefit" method adopted by the Eleventh Circuit in *Camden I Condominium Ass'n, Inc. v.  Dunkle,* 946 F.2d 768 (11th Cir. 1991). The requested fees are 9.4 percent of the more than $53.2 million total monetary value of the settlement. (Hall Decl. at ¶¶ 103-04); (Declaration of expert statistician Jeffrey Martin at ¶¶ 28, 31, 34).[1] The requested fee percentage is well below what courts routinely award upon the successful resolution of a class action. The amount of expenses totaling $100,000.00 sought by Class Counsel, all of which are reasonably and necessarily expended (or will be expended)[2] in prosecution of this action, also should be approved. The reasonableness of the requested fee and expenses, furthermore, is supported by Michael Tanner, of Tanner Bishop PA, a leading practitioner in Jacksonville.

The Court also should approve an award of $10,000.00 to compensate Named Plaintiffs Bastian, Laker, and Sutton; and $8,000.00 to compensate Named Plaintiffs Love and Smith for their service as class representatives, as provided under the settlement. The awards are justified both legally and factually.

---

[1] Christopher B. Hall and expert Jeffrey Martin each also made declarations in support of the Motion for Preliminary Approval. (Doc. 129-2). References to the Hall, Markham, Tanner, and Martin declarations herein are references to those declarations filed with this Motion.

[2] Class Counsel have expended over $83,000 to date, but that amount will reach over $100,000 after Plaintiffs pay all expert fees and travel to the final approval hearing. (Hall Decl. at ¶ 116).

## FACTS

Plaintiffs respectfully refer the Court to the Declarations of Mr. Hall and Tracy L. Markham, which provide extensive descriptions of the case, risks, and efforts of Class Counsel and Named Plaintiffs.  Plaintiffs provide here an abbreviated description of these efforts.

Original Named Plaintiff Bastian's claims arose when she sought assistance from and complained to Tracy Markham that Garrison Property and Casualty Insurance Company ("Garrison") was not paying her enough on her first party total loss auto claim. (Hall Declaration at ¶ 5); (Markham Decl. at ¶¶ 11-12).

Ms. Markham reviewed claim documents and noticed that Garrison would not reimburse Plaintiff Bastian for sales tax on the total loss vehicle unless Ms. Bastian paid sales tax on the purchase of a replacement vehicle and provided to Garrison proof of payment of such sales tax payment.  Even then, Garrison would only pay the lesser of the sales tax due on the insured vehicle and the sales tax paid on the replacement vehicle. (Hall Decl. at ¶ 6); (Markham Decl. at ¶ 14).

Having represented claimants on other auto claims, Ms. Markham could not recall another insurer with this practice.  Ms. Markham decided to investigate by securing a copy of the policy and contacting Christopher Hall with Hall & Lampros to consult on the case.  Ms. Markham knew that Hall & Lampros had experience in class action cases. (Hall Decl. at ¶ 7); (Markham Decl. at ¶ 15).

The Garrison practice that Ms. Markham found questionable, and which this Court later found to be a breach of the insurance contract, had been in place by Garrison and the three other USAA branded Florida insurers for over eleven (11) years (since December 2001) before

3

Ms. Markham's investigation. (Hall Decl. at ¶ 8).  Plaintiffs estimate that during this period, USAA adjusted and paid on over 100,000 first party total loss claims with this improper practice.  During this period not a single lawyer did all of (1) questioning the practice; (2) investigating the practice; (3) determining, without precedent, that the practice breached the insurance policies; and (4) pursuing a remedy in a court of law. *Id.*

Before filing suit, Class Counsel investigated the case by extensively analyzing the subject insurance policy, researching regulatory, statutory, and common law, public insurance records (including form filings, premium reports, complaints, and other documents) from Florida and other states, and sales tax practices of USAA and other insurers in Florida and other states.  (Hall Decl. at ¶¶ 10-22).

On October 17, 2013, Plaintiff filed suit in the Circuit Court for St. Johns County against the four USAA branded insurance companies alleging damages for all USAA Florida insureds who suffered first party total loss claims and were not paid all of the sales tax due under their policies.  (Docs. 1 and 2) Plaintiff also sought injunctive relief seeking that USAA change its practice and procedure of withholding sales tax unless and until the sales tax was incurred on the purchase of a replacement vehicle.  *Id.*

Defendants removed the case to federal court and, on December 2, 2013, filed a motion to dismiss on grounds that Fla. Stat. § 626.9743 ("626.9743") expressly permitted Defendants to withhold sales tax until incurred; and that the Bastian insurance policy by its terms did not require payment of sales tax. (Doc. 9).  Plaintiff responded in opposition on December 16, 2013. (Doc. 15).  The Court heard oral argument on April 4, 2014. (Hall Decl. at ¶ 26).

On April 22, 2014, the Court denied Defendants' motion to dismiss without prejudice

and permitted discovery on the sole issues of whether 626.9743 permitted the withholding of sales tax and whether the policy (without regard to 626.9743) required payment of sales tax without it being incurred. (Doc. 35); (Hall Decl. at ¶ 27).

During this initial discovery period limited only to the application of 626.9743 and whether the policy required payment of sales tax, Plaintiff served two sets of interrogatories, three sets of document requests, and requests for admission, took depositions, and reviewed a document production with over 75,000 pages of documents.  (Hall Decl. at ¶ 30).

On November 21, 2014, Defendants' moved for summary judgment on the issue of liability. (Doc. 47). Most important to Defendants' motion were the alternative dispositive assertions that (1) the terms of 626.9743 were clear and expressly permitted USAA to treat sales tax in the same manner as USAA treated sales tax with Plaintiff; and (2) sales tax was neither mentioned in the policy provisions nor covered under the definitions of "actual cash value" or "loss." *Id.* Defendants also presented evidence of legislative and regulatory history, and other documents purporting to show that the practice of withholding sales tax was long the law of Florida. *Id.* at 6-9

On December 19, 2014, Plaintiff responded in opposition to the Motion for Summary Judgment, and filed a Cross Motion for Summary Judgment. (Doc. 61, 65 (Corrected Response)).[3]  Plaintiff's response and motion showed that USAA relied on 626.9743 to override the policy terms and permit withholding of sales tax until incurred. Plaintiff showed that 626.9743(9) was a permissible statutory provision that, under Florida law, did not control

---

[3] The cross motion asserted that resolution of Defendants' Motion for Summary Judgment essentially resolved the liability issue in favor of either Plaintiff or Defendants.  If the Court denied Defendants' Motion for Summary Judgment, then judgment should be granted in favor of Plaintiff.

unless incorporated expressly into the policy. *Id.*  Plaintiff showed that insurers and insureds have rights to contract for coverage greater than minimum coverage guaranteed by statute, and that the Bastian insurance policy required payment of sales tax without precondition that she incur sales tax on the purchase of a replacement vehicle. *Id.*; (Hall Decl. at ¶ 39).[4]

On May 18, 2015, the Court heard oral argument on motions for summary judgment, took the motions under advisement, and encouraged mediation. *Id.* at ¶ 40.

Defendants refused to mediate on a class wide basis but offered each Named Plaintiff 100 percent of their claim to settle out from under the class. *Id.* at ¶ 41. In the face of uncertainty as to how the Court would rule on summary judgment, each Named Plaintiff refused this offer to be made whole and acted in the best interest of the class. *Id.* at ¶ 42.

On September 29, 2015, the Court denied Defendants' Motion for Summary Judgment and took under advisement Plaintiffs' Cross Motion for Summary Judgment.  (Doc. 90).

### Petition for Appeal to Eleventh Circuit

Defendants refused to make an offer to settle the matter on a class basis and insisted their expectation that the Eleventh Circuit would reverse. (Hall Decl. at ¶ 51).  Defendants sought, and the Court granted, permission to petition the Eleventh Circuit for interlocutory appeal on the grounds that there existed substantial grounds for difference of opinion on the issues of application of 626.9743 and whether the policy required payment of sales tax. Amended Order at 22 (Doc. 96).  Defendants petitioned the Court of Appeals and Plaintiffs

---

[4] The same day, Plaintiff moved to amend the complaint to add Named Plaintiffs Sandra Adda, Oliver Sutton, William Laker, and Robert Beltrami, who were first party total loss insureds under policies issued by United Services Automobile Associations, USAA-CIC, and USAA-GIC. (Doc. 59).  Sandra Add and Robert Beltrami were required to withdraw as Named Plaintiffs and were replaced by Ryann Love and Terry Smith just before the mediations and formally substituted at time of settlement. (Hall Decl. at ¶ 59); *see also* (Doc. 126, Consent Motion to Reopen and to Substitute Named Plaintiffs).

opposed. (Hall Decl. at ¶¶ 54-56). The Court of Appeals denied Defendants' petition on February 29, 2016, and the case proceeded to discovery. *Id.* at ¶¶ 57-58.

### Class Certification and Damages Discovery

Plaintiffs' discovery focused heavily on the electronic data necessary to establish that class certification is proper, and to prove damages. *Id.* at ¶ 60.  The discovery also focused on expected defenses that tens of thousands of individual claim files needed to be reviewed to establish liability and damages for each class member, and that individual review of claim files was needed to address liability, damages, and set-off issues. *Id.* Class wide *liability* was complicated because USAA paid some class members in full for all sales tax that was due, and thus was not liable to those class members. *Id.* at ¶ 61. The *damages* issue was complicated because USAA paid some class members for part of the sales tax that was due, and the claims data did not identify those partial payments, and the amounts. *Id.* at ¶ 62.  USAA claimed that the amount actually owed for those class members was an individualized issue. *Id.*  The potential *set-off* issues were USAA's claim that they had overpaid on some class member total loss claims unrelated to the sales tax issue, and therefore the overpayment should be considered when calculating any damages for any alleged underpayment of sales tax. *Id.* at ¶ 63.  USAA produced pre-lawsuit audit data showing alleged overpayments that USAA claimed needed to be considered as part of any class member recovery. *Id.*

Defendants produced incomplete and error-filled data requiring Class Counsel repeatedly to insist on supplemental and corrected data productions.[5] *Id.* at ¶¶ 64-65.

---

[5] See (Doc. 114-1), letters from Plaintiffs' counsel Hall to Defense counsel Ackerman of June 21, 2016 (missing sales tax data, sales tax payment data, actual cash value data, errors in data, and other problems with the data); June 22 (missing data, missing data fields information, missing data source information); June 22 (second letter of day) (noting that Plaintiffs requested a Fed. R. Civ. P. 30(b)(6) deposition on May 24 and attaching notice);

Defendants' responses to these demands were to continue to supplement data productions while denying Plaintiffs access to what Plaintiffs believed was the best available data to prove the claims. *Id.* at ¶ 65. Defendants produced six different sets of data on June 15, June 27, July 5, August 12, August 15, and August 16 of 2016. *Id.* Each of these data productions provided a little more information relating to the same claims and were only reluctantly produced in response to Class Counsel's persistence. *Id.*

During the discovery of this case, Defendants produced over 250,000 pages including claims handling procedures information, manuals, legislative history, emails, complaint documents, reinspection program documents and data, over 600 lengthy claims files, and information regarding vehicle valuation. *Id.* at ¶ 68.  Defendants also produced voluminous data files relating to 76,460 insurance claims, 289,994 claim payments, and 73,905 vehicle valuations and sales tax computations. *Id.*; (Martin Decl. at ¶¶ 8-10).

Not until Plaintiffs filed their Motion to Compel Electronic Data (Doc. 114) did Defendants produce crucial sales tax and payee data. (Hall Decl. at ¶ 66). With this data, Class Counsel finally could determine by algorithm for the majority of claims whether sales tax was paid and the amount of any underpayment. *Id.* at ¶ 71.  But data still appeared to be missing relating to many total loss claims. *Id.*

It was at this posture that the parties went to mediation on August 31, 2016 before Terrence M. White. *Id.* at ¶ 72. At the mediation, the parties agreed to the framework of a

---

June 23 (failure to produce metadata); June 27 (improper and erroneous redactions); June 30 (apparently missing data in reinspection program files and request for sample files); July 18 (missing data, data sources that have not been identified or searched for information, improper 30(b)(6) witness, need for depositions); July 20 (requesting data source for reinspection data produced to support Defendants' claims); July 21 (erroneous redactions, missing data, errors in Nature of Pay fields relating to payees).

settlement. *Id.* The parties requested a stay to pursue settlement negotiations. (Doc. 119).

In the seven months following the mediation, and with the participation of Named Plaintiffs, the parties continued to negotiate to resolve all issues involving the class including scope of release, mailed notice, electronic notice, electronic claim making procedures, email notice, hard copy claim form, electronic claim form, scope of pre-filled claim form information, data from which pre-filled claim form information would be derived, press release, functionality of website, claim process integrity, and all other issues in the 116-page settlement agreement. (Hall Decl. at ¶ 73); (Markham Decl. at ¶ 32). This agreement was reached on or about March 13, 2017.  (Hall Decl. at ¶ 73).

All terms of the settlement were determined and agreed before negotiations of attorneys' fees and service awards.  The negotiations of attorneys' fees and service awards were at arm's length. *Id.* at ¶¶ 77, 117; (Tanner Decl. at ¶ 19).

### The Preliminarily Approved Settlement

The settlement requires Defendants to: (1) make payment to all settlement class members who submit timely claims in an amount that is the full amount that Plaintiffs claim they would have recovered if Plaintiffs prevailed on their breach of contract claim in this lawsuit, plus 8 percent to account for interest that may be claimed; (Doc.129-1, Settlement Agreement at ¶¶ 65-68); and (2) change their practice and pay sales tax at time of settlement unless or until USAA changes its policy forms to inform policyholders that sales tax will be withheld, or there is change in the law or a contested court ruling favorable to Defendants on this issue. (Doc. 129-1, at ¶ 112).  On or about October 15, 2016, Defendants began paying sales tax without the requirement that sales tax be incurred.  (Hall Decl. at ¶ 79).

## Settlement Value

The settlement cash value for all past claims under the terms of the settlement is approximately $35.4 million during the class period October 17, 2008, through October 15, 2016. (Martin Decl. at ¶¶ 11, 27-28).[6]

The value of Defendants' agreement to change their practice with regard to payment of sales tax was approximately $600,000 per month at the time the change was implemented, and increases each month. *Id.* at ¶ 31. Through October 24, 2017, the approximate value of Defendants' agreement to pay sales tax at time of settlement (or revise their policy forms, which they have not done) is approximately $8.5 million. *Id.* If, on the day following the fairness hearing, USAA decided to change its policy language to disclose that they will begin withholding sales tax until incurred, such a change would take effect as policies came up for renewal. (Hall Decl. at ¶ 85); *see also* (Doc. 1 at ¶ 24). During this period, USAA would continue to pay sales tax on total loss claims for policies that had not come up for renewal, which adds another $4.2 million benefit to the class from the lawsuit.[7] (Martin Decl. at ¶ 34).

The proposed settlement also provides that Defendants will not oppose an application for fees and costs of $5.1 million, and service awards of $10,000 each for Named Plaintiffs Chantal Bastian, William Laker and Oliver Sutton, and $8,000 each for Named Plaintiffs Ryann Love and Terry Smith. (Doc. 129-1, at ¶ 84). None of the attorneys' fees, costs, or

---

[6] The Motion for Approval and supporting declarations estimated the cash value at $34 million through October 15, 2016. Because Plaintiffs' expert had data only through May, 2016, the expert estimated (by regression analysis) the expected claims for the period through October 16, 2016. There were more first party total loss claims than expected during the period May through October 15, 2016, in part Plaintiffs believe, because of Hurricane Matthew. (Hall Decl. at ¶ 80, n. 11). The cash value thus increased to $35.4 million based on the actual number of total loss claims. (Martin Decl. at ¶ 11).

[7] If USAA does not changes its policy forms and continues to pay sales tax, the value to class members for the one year after the October 24, 2017 hearing would be $9.5 million. (Martin Decl. at ¶ 32).

incentive awards reduces in any way the cash available for 108 percent of alleged damages for recovery to the class. *Id.*

### Claims Process

Class Counsel negotiated a notice and claims process which assured that the claims rate on this matter would be higher than typical, and substantially higher than another recent USAA case. *See* (Doc. 133, Notice to Court); (Hall Declaration ¶¶ 74-75); (Markham Decl. at ¶ 32). The claims rate is over 30 percent to date.[8, 9] (Hall Decl. at ¶ 97).

### Case Risks

The case presented substantial risks, including but not limited to the following:

(a)  626.9743 at first appeared to be on point in favor of Defendants;

(b)  it was a case of first impression - - and thus unpredictable - - with regard to the application of 626.9743 and whether sales tax is included in actual cash value for private passenger vehicles;

(c)  there was unpredictability due to the possibility that FOIR could already have issued an opinion, or could issue an unfavorable opinion in response to the lawsuit or request from USAA;

(d)  documents suggested that FOIR knew of USAA's practice and interpretation of 626.9743 and yet appeared not to object to such practice;

(e)  legislative history indicated the intention of the legislature to incorporate a prior regulation permitting the withholding of sales tax, and to give insurers the option of withholding sales tax until incurred;

(f)  class certification would depend on access to sufficient data to determine liability and damages;

(g)  Plaintiffs were unsure of individualized issues that would arise creating an obstacle to class certification;

(h)  Plaintiff may not have standing to pursue claims against the three largest USAA insurers in Florida, because Plaintiff was an insured only of Garrison;

(i)  Damages were uncertain because Garrison was the smallest of the USAA Florida insurers, and Class Counsel anticipated (incorrectly) that most USAA insureds

---

[8] Plaintiffs believe that the actual claims rate for persons who have valid claims is higher because 30 percent of class members who received notice were paid their sales tax in full and have no claims. The Notice and communications about the case from Class Counsel informed recipients that those who were already paid their sales tax would not receive a recovery. (Hall Decl. at ¶¶ 97-98).

[9] The Declarations of Tanner and Markham cite a claims rate of just below 30 percent based on a claims administration report that was one week earlier than the report on which the Hall Declaration relies.

> would have received their sales tax even under the sales tax practice implemented by USAA.

(Hall Declaration at ¶ 100).  Class Counsel believed that many of the risks identified should not be relevant to whether Florida law and the insurance policy required payment of sales tax without precondition. *Id.* at ¶ 100 n. 14.

## ARGUMENT AND CITATION OF AUTHORITY

### I.    The Court Should Give Great Weight to the Parties' Agreement.

This Court is not bound by the parties' agreement, and, indeed, has a duty to independently evaluate the requested fees. Nonetheless, the agreement is entitled to great weight because it resulted from adversarial negotiations after the merits were decided. *See, e.g., Strube v. Am. Equity Inv. Life Ins. Co.,* 2006 WL 1232816 at *2 (M.D. Fla. May 5, 2006); *Elkins v. Equitable  Life Ins. Co.,* 1998 WL 133741 at *34 (M.D. Fla. Jan. 27, 1998); *Ingram v. Coca-Cola Co.,* 200 F.R.D. 685,695 (N.D. Ga. 2001).  As has been noted:

> The Court finds that the fee and expense negotiations were conducted at arm's length, only after the parties had reached agreement on all terms of the Settlement. There is no evidence in this case that the Settlement, or the fee and expense agreement, was in any way collusive.   Under these circumstances, the Court gives great weight to the negotiated fee in considering the fee and expense request.
>
> Such agreements between plaintiffs and defendants in class actions are encouraged, particularly where the attorneys' fees are negotiated separately and only after all terms of the settlement have been agreed to between the parties. *See Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983) (noting that negotiated, agreed upon attorneys' fees are the "ideal" toward which the parties should strive and stating that "[i]deally, of course, litigants will settle the amount of a fee").

*Manners v. Am. Gen. Life Ins. Co.,* 1999 WL 33581944 at *28 (M.D. Tenn. Aug. 11, 1999) (some internal citations omitted); *see also, e.g. Johnson v. Georgia Highway Express, Inc.,* 488

F.2d 714, 720 (5th Cir. 1974) ("In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees.").

This Court has cited *Manners* with approval, and held:

> The Court finds that the parties' agreement with regard to the payment of fees and expenses was not reached until after a settlement had been reached in principle on its other terms and that the agreement was not the product of collusion or fraud. As a result, the parties' agreement is entitled to substantial weight. *See, e.g., Strube v. Am. Equity Inv. Life Ins. Co.*, 2008 U.S. Dist. LEXIS 28582 at *6–7 (M.D. Fla. May 5, 2006); *Elkins v. Equitable Life Ins. Co.*, 1998 U.S. Dist. LEXIS 1557 (M.D. Fla. Jan. 27, 1998); *Ingram v. Coca–Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001); *Manners v. Am. Gen. Life Ins. Co.*, No. 3–98-0266, 1999 WL 33581944, at *28 (M.D. Tenn. August 11, 1999).

*James D. Hinson Elec. Contracting Co., Inc. v. BellSouth Telecomm. Inc.,* 3:07-CV-598-TJC-MCR, 2012 WL 12952592, at *2 (M.D. Fla. July 30, 2012) (*Hinson I*).

Many reasons support deferring to the parties' agreement.  First, there is no one "reasonable fee" mandated by applicable law. The notion of reasonableness encompasses a range of numbers about which there can be a legitimate difference of opinion. So long as the requested fee is one that the court agrees is within the range of reasonableness, it should be approved.  Second, the agreement reflects the economic  realities of the marketplace, one in which USAA wanted to pay as little as possible while Class Counsel had an incentive to obtain a larger award. The competing pressures on the parties served as a substitute for the incentives that normally drive private fee negotiations, ensuring that the agreed upon fee did not constitute a windfall. *See generally, In re Continental Illinois Sec. Lit.,* 962 F.2d 566, 572-73 (7th Cir. 1992) (noting that the court's objective is to award a fee providing the lawyers what they would have achieved through arm's length bargaining with a paying client). Third, the fees and costs

negotiated take nothing away from the class members, who pursuant to earlier negotiations were to receive 108 percent of their actual damages by separate payment if they make a claim. (Doc. 129-1, at ¶ 84).  And fourth, reducing the agreed fee would discourage competent attorneys from handling class actions and agreeing to compromise their fee claims in settlement.

## II.    The Requested Fee is Reasonable under the Common Fund Doctrine.

### A.    The Common Fund Doctrine and Eleventh Circuit Law.

Courts have long recognized the common fund doctrine, under which attorneys who create a recovery benefitting a group of people may be awarded their fees and costs from the recovery. *See, e.g., Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980).  The doctrine serves the "twin goals of removing a potential financial obstacle to a plaintiffs pursuit of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiffs efforts," *In re Gould Sec. Lit.,* 727 F.Supp. 1201, 1202 (N.D. Ill. 1989).

In a case such as this one, the Eleventh Circuit has directed that the fee be based upon a percentage of the class benefit. *Camden I,* 946 F.2d at 774-75. A court has a great deal of discretion in choosing the proper percentage. "There is no hard and fast rule . . . because the amount of any fee must be determined upon the facts of each case." *Id.* at 774. The court should look at such factors as the time required reaching a settlement, whether there are any substantial objections, the economics of a class action, the criteria set out in *Johnson v. Georgia Highway Express,* and any other "unique" circumstances. *Id.* at 775. In *Camden I,* the Eleventh Circuit recognized that a fee award of 50 percent of the benefit

14

is the upper limit; that the majority of fee awards fall between 20 and 30 percent; and 25 percent serves as the "benchmark" unless the circumstances suggest a more appropriate percentage. *Id.* at 774-75.

### B.   The Requested Fee Here is Less than 10 Percent of the Class Benefit.

The benefit to the class from the settlement in this case consists of: (1) the cash payment to which class members are eligible to receive by filing a claim;[10] (2) the value of USAA's agreement to cease it practice of conditioning the payment of sales tax on the insured incurring sales tax on a replacement vehicle; and (3) the fees and expenses agreed to be paid by USAA. *See, e.g., Camden I,* 946 F.2d at 771 (recognizing that fees are proper under the common fund approach where the class receives "monetary or nonmonetary benefits"); *Hinson v. AT&T Services, Inc.,* No. 3:13-cv-00029-TJC-JRK (Order of 12/16/16, Doc. 172)) (*Hinson II*) (approving fees of under 12 percent of a common benefit fund including cash available to class, attorneys' fees and costs, and benefit of change in practices); *Manual for Complex Litigation* § 21.7 at 335 (4th ed.) ("If an agreement is reached on the amount of a settlement fund and a separate amount for attorney's fees and expenses... the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class").[11] Numerous decisions recognize that fees paid separately by a

---

[10] The entire fund available to class members is used to determine the benefit to the class for the purpose of determining fees. That class members did not file claims for the entire amount available under the settlement does not impact the fee analysis. Both the Supreme Court and the Eleventh Circuit have approved calculating fees based on the total value of the settlement, regardless of the actual payout to the class. *See Van Gemert,* 444 U.S. at 480-82; *Waters, v. Int'l Precious Metals Corp,* 190 F.3d 1291, 1295-97 (11th Cir. 1999). This approach is widely followed, both in this circuit and elsewhere. *See, e.g., Montoya v. PNC Bank. NA,* 2016 WL 1529902 at *16 (S.D. Fla. Apr. 13, 2016); *Pinto v. Princess Cruise Lines,* 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007); *Stahl v. MasTec, Inc.,* 2008 WL 2267469 at *1 (M.D. Fla. May 20, 2008); *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 437-38 (2d Cir. 2007); *Williams v. MGM- Pathe Comm. Co.,* 129 F.3d 1026, 2017 (9th Cir. 1997).

defendant are included in the class benefit. *See, e.g., Poertner v. Gillette Co.,* 618 Fed. Appx. 624, 628 (11th Cir. 2015); *Johnston v. Comerica Mtg. Corp.,* 83 F.3d 241, 245-46 (8th Cir. 1996); *In re Managed Care Lit.,* 2003 WL 22850070 at *6 (S.D. Fla. Oct. 24, 2003); *David v. American Suzuki Motor Corp.,* 2010 WL 1628362 at *8 n.14 (S.D. Fla. Apr. 15, 2010). This makes sense because if the fees were not paid separately, class members would have to pay them directly out of the fund.

The fees requested by Plaintiffs here are less than 10 percent of the value of the benefits to the class.  The benefits to the class exceed $53.2 million, which includes $35.4 million that USAA has made available to class claimants, $5.1 million for attorneys' fees and costs, $8.5 million in benefit from October 15, 2016 through October 24, 2017 due to USAA's changed practice of paying sales tax, and a minimum benefit of $4.2 million for USAA's change in practice for the one year after the October 24, 2017 fairness hearing. (Hall Decl. at ¶¶ 103-04); (Martin Decl. at ¶¶ 28, 31, 34).  The requested fee  of $5 million is less than 10 percent of the total benefit to the class ($5 million divided by $53.2 million = 0.0939).[11] *Id.*

**C.     The Percentage Sought by Class Counsel is Justified.**

The requested fee meets the guidelines of *Camden I* and, at less than 10 percent of the class benefit, is "well below the benchmark amount" of 25% approved by the Eleventh Circuit. (Tanner Decl. at ¶ 15). Even if the requested fee amounted to 30 percent of the benefit, it would

---

[11] Even if the Court looked at the actual claims made to determine the cash benefit to the Class (which is not the method that Courts in this Circuit consider the issue), the percentage fee would be less than 18 percent. This is because there have been over 30 percent claims made to date on a benefit fund of $35.4 million, which is a claims made recovery of $10.6 million. The sum of the $10.6 million, $5.1 million in attorneys' fees and costs, and $12.7 million for USAA's change in practice is $28.4 million. Fees of $5 million is 17.6 percent of that amount (5 / 28.4 = .176). (Hall Decl. at ¶ 105). The requested fee also is reasonable even if the Court considers the $35.4 million cash benefit alone without consideration of the benefit to the class from USAA's change in practice. (Tanner Decl. at ¶ 16).

still fall within the range approved in *Camden 1.* The requested fee therefore is justified under the case law and the facts of this case. *See, e.g., Waters,* 190 F.3d at 1295 (approving fee of 33 and 1/3 percent); *Morefield v. NoteWorld, LLC,* 2012 WL 1355573 at *5 (S.D. Ga. Apr. 18, 2012) (approving fee of 33 and 1/3 percent); *In re Checking Account Overdraft Litig.,* 2014 WL 11370115 at* 13 (S.D. Fla. 2014) (awarding fees of 30 percent); *Allapattah Services., Inc. v. Exxon Corp.,* 454 F.Supp.2d 1185, 1240 (S.D. Fla. 2006) (awarding fees of 31 and 1/3 percent of settlement); *Pinto v. Princess Cruise Lines,* 513 F.Supp.2d 1334, at 1342 (awarding a 30 percent fee).

An analysis of the specific factors set out in *Camden I* which follows, demonstrates that the requested fee is fair and reasonable. *Camden I,* at 772, n. 3. This conclusion is supported by Mr. Tanner, who concluded that the "factors are relevant and support the $5 million fee to class counsel in this case, whether the fee is calculated as a percentage of $53.2 million or of $35.4 million." (Tanner Decl. at ¶ 16).

### 1.  The Time and Labor Required.

Substantial time and labor was required in investigating and litigating this case since June, 2013. (Hall Decl. at ¶ 118). Class Counsel invested in excess of 3,500 hours having a value of over $2.14 million, and are expected to expend 225 more hours valued at more than $120,000.00 through time of settlement and claim determination review.[12] (Hall Declaration at ¶¶ 107-09, 112); (Markham Decl. at ¶ 37). Much of the time involved pre-suit investigation; voluminous document review; extensive research and briefing relating to regulatory,

---

[12] Class Counsel still must prepare a motion for final approval, attend the approval hearing, continue to monitor the claims administration process, and audit a sample of 300 claims to ensure that USAA is properly calculating damages.  (Doc. 129-1, at ¶ 76(f) (Class Counsel claims determination review)).

statutory, and common law; Eleventh Circuit briefing; depositions; data analysis; review of over 600 voluminous sample claim files to check damage analysis and discovery sources of electronic data; and the lengthy negotiating process relating to the 116 pages of settlement documents. (Hall Decl. at ¶¶ 10-77). Class Counsel also has spent considerable time ensuring that class members are aware of their claims and the process with which claims can be made. (Hall Decl. at ¶¶ 93-96); (Markham Decl. at ¶¶ 34-36). Class Counsel expects to spend considerable time auditing USAA claims determinations even after final approval of settlement. (Hall Decl. at ¶ 108); (Markham Decl. at ¶ 37).

The work was justified in view of the issues and how the case was defended. As a result, this factor supports the requested fee. (Tanner Decl. at ¶ 16(a)).

### 2.  The Novelty and Difficulty of the Questions Involved.

The case involved issues of first impression relating to the application of 626.9743 and whether sales tax is included under the definition of actual cash value for private passenger auto policies. (Doc. 96, at 1). These legal issues required analysis and briefing relating to legislative history, and regulatory, statutory, and common law. There were also complex factual issues requiring expert involvement to analyze voluminous data for over 75,000 claims and 280,000 payments over an eight year period. (Hall Decl. at ¶ 64). Class Counsel vigorously pursued the production of electronic data to enable Class Counsel to prepare for class certification issues. *Id.* at ¶¶ 65-66. The result of Class Counsel's pursuit was Defendants supplemental production of six sets of data, with two crucial sets of data produced only after a voluminous motion to compel was filed. *Id.* The difficulty of the case supports the requested fee award. *See* (Tanner Decl. at ¶ 16(b)).

### 3.   The Skill Requisite to Perform the Services Properly.

"[T]is case required class counsel with a very high level of energy, skill and experience in class action litigation.  It required counsel with the expertise to address the many legal issues and with the experience to manage the logistics inherent in a class comprised of thousands of members." (Tanner Decl. at ¶ 16(c)). Class Counsel had the necessary experience and skill.

### 4.   The Preclusion of Other Employment.

Due to the substantial time commitment by Hall & Lampros and Avolio & Hanlon both firms forewent other fee and profit-generating opportunities in pursuit of this case. (Hall Decl. at ¶ 118); (Markham Decl. at ¶ 39); *see also* (Tanner Decl. at ¶ 16(g)).

### 5.   The Customary Fee.

The usual fee range for common fund cases is 20% to 30%, with 50% at the upper limit. *Camden I,* 946 F.2d at 774, 775.  The fee requested under this settlement is well under this customary range. *Id.; see also,* (Tanner Decl. at ¶ 16(g)).

### 6.   Whether the Fee is Fixed or Contingent.

This action was prosecuted entirely on a contingent fee basis. (Hall Decl. at ¶115). If Plaintiffs had not achieved a recovery, Class Counsel would have received nothing and would have suffered a direct out-of-pocket loss of all expenses due to the fact that they advanced all the expenses of the litigation.  Numerous courts have recognized  that such risk deserves extra compensation and is a critical factor in determining the reasonableness of a fee. *See, e.g. In re Dun & Bradstreet Credit Svcs. Cons. Lit.,* 130 F.R.D. 366, 373 (S.D. Ohio 1990); *Behrens v. Wometco Enterprises., Inc.,* 118 F.R.D. 534, 548 (S.D. Fla. 1988),

*aff'd,* 889 F.2d 21 (11th Cir. 1990); *In re Cont. Ill, Sec. Lit.,* 962 F.2d 566, 569 (7th Cir. 1992).

### 7.   Time Limitations Imposed by the Client or Circumstances.

There were times during this litigation when Class Counsel worked under considerable time pressure due to various deadlines. Class Counsel do not contend that this  factor justifies either a higher or lower fee as time pressure in cases of this sort is expected.

### 8.   The Amount Involved and the Results Obtained.

"[C]lass counsel obtained a very substantial recovery for the class under difficult circumstances." (Tanner Decl. at ¶ 16(e)).  Class members who make a claim will recover 108 percent of the sales tax that the lawsuit alleges they were underpaid. (Doc.129-1, at ¶¶ 65-68).  The amount of cash available to make these payments is approximately $35.4 million. (Martin Decl. at ¶ 11). The value to class members from USAA's agreement to change its practice is $8.5 for the period until the fairness hearing, and a minimum of $4.2 million for the one year after the fairness hearing. *Id.* at ¶¶ 31, 34. The common benefit fund conservatively is thus $35.4 million plus $5.1 million plus $8.5 million plus $4.2 million = $53.2 million. (Hall Decl. at ¶¶ 103-04); (Martin Decl. at ¶¶ 28, 31, 34).

### 9.   The Experience, Reputation, and Ability of the Attorneys.

The lawyers who represent the class have considerable experience, skill and reputation in both complex civil litigation and class  actions. "I believe the members of the class counsel team had a very high level of expertise and skill for cases of this type." (Tanner Decl. at ¶ 16(d)).

### 10. The Undesirability of the Case.

This case was not undesirable except to the extent that it was a difficult case with substantial risk that was vigorously defended, as well as a case of first impression.

### 11. The Nature and Length of the Relationship with the Client.

Class Counsel had no prior relationship with any of the Named Plaintiffs before this case. Class Counsel entered their standard representation agreements with each of the Named Plaintiffs. Class Counsel do not believe that this factor supports an adjustment of the fee award.

### 12. Awards in Similar Cases.

The fee requested is "well under [the] customary range." (Tanner Decl. at ¶ 16(g)); *see also, Camden I,* 946 F.2d at 774, 775. The fees sought by Class Counsel here are consistent with and lower than fees in similar cases. *See, e.g., Waters,* 190 F.3d 1291 (11th Cir. 1999) (33 1/3 percent); *In re Checking Account Overdraft Litig.,* 830 F. Supp. 2d. 1330, 1357 (S.D. Fla. 2011) (30 percent); *Columbus Drywall & Insulation, Inc. v. Masco Corp.,* 2012 WL 12540344 at *2 (N.D. Ga. Oct. 26, 2012) (awarding fee of 33 and 1/3 percent and listing other cases awarding fees based on similar or higher percentages); *In re Friedman's, Inc. Securities Litig.,* 2009 WL 1456698 at *4 (N.D. Ga. May 22, 2009) (approving 30 percent fee); *Wolff v. Cash 4 Titles,* 2012 WL 5290155 at *5-6 (S.D. Fla. Sept. 26, 2012) (noting that fees in the Eleventh Circuit are "roughly one-third" of the benefit to the class and listing numerous cases awarding fees of 30 percent or higher).

### 13. Other Factors

The economics of class actions require that class counsel be adequately compensated; otherwise consumers will find it increasingly hard to find good lawyers to

take their cases.  As one court observed:

> [C]ourts . . ..have acknowledged the economic reality that in order to
> encourage "private attorney general" class actions brought to enforce the
> securities laws on behalf of persons with small individual losses, a financial
> incentive is necessary to entice capable attorneys, who otherwise could be
> paid regularly by hourly-rate clients, to devote their time to complex, time-
> consuming cases for which they may never be paid.

*Mashburn v. Nat'! Healthcare, Inc.,* 684 F.Supp. 679, 687 (M.D. Ala. 1988); *see also, e.g.*

*In re Checking Account Overdraft Litig.* 2014 WL 11370115 at *17 and 18 (If class

counsel is not awarded a bonus, "very few lawyers could take on the representation of a

class client given the investment of substantial time, effort, and money, especially in light

of the risks of recovering nothing") (*quoting Behrens*, 118 F.R.D. at 548). "Without [a]

premium incentive, it simply would make no economic sense for counsel to undertake a

case like this one." (Tanner Decl. at ¶ 18).

## III.    The Requested Fee is Reasonable under the Lodestar Approach.

While requiring use of the percentage of the benefit method in cases such as this one,

the Eleventh Circuit has authorized courts to use the lodestar method as a cross-check on the

reasonableness of the requested fee. *Waters*, 190 F.3d 1291 at 1298. The requested fee here is

reasonable under the lodestar approach, which permits multiples that range "from less than 2

to more than 5 times the time value of the hourly charges." (Tanner Decl. at ¶ 18).  A $5 million

award to Class Counsel "is reasonably sufficient (slightly more than 2x) to compensate [Class

Counsel] for the economic risks they undertook in accepting and prosecuting this case." *Id.;*

*see also, e.g., Ingram,* 200 F.R.D. at 696 (noting that multipliers range from less than two to

more than five times the reasonable hourly charges); *Manners,* 1999 WL 33581944, at *31

(finding that a multiplier of 3.8 was justified, noting that multipliers in similar litigation have

ranged from 1 through 4, and collecting the relevant cases); *Behrens,* 118 F.R.D. at 549 (S.D.

Fla. 1988) (determining that multipliers range from 2.26 to 4.5 with "three appear[ing] to be

the average"); *Kuhnlein v. Dept. of Revenue*, 662 So. 2d 309, 315 (Fla. 1995) (multiplier of 5

proper in class action to place greater emphasis on monetary results achieved and to alleviate

contingency risk factor and attract high level counsel).

If a typical lodestar and multiplier analysis were employed in this case, Class Counsel

could seek a substantially larger fee.[13] Neither of Class Counsel would have undertaken this

case without the opportunity for a multiplier. (Hall Decl. at ¶ 118); (Markham Decl. at ¶ 12).

## IV. The Court Should Approve Reimbursement to Class Counsel for Expenses.

Class Counsel seeks approval of $100,000 in costs and expenses. Class Counsel to date

has expended over $83,000.00 in litigation costs and expenses, and will have expended over

$100,000.00 when payment of all costs have been made before the October 24, 2017 hearing.

(Hall Decl. at ¶ 116).

All of the expenses for which the lawyers seek reimbursement are reasonably and

necessarily incurred (or will be incurred) on behalf of the class. *Id.* An itemization of such

expenses is attached to the Hall Declaration. *Id.* A supplemental itemization, showing expenses

of over $100,000.00 will be filed before the fairness hearing. The Court should direct USAA

---

[13] Plaintiffs' expert Michael Tanner has reviewed Class Counsel's billing and lodestar records. Typically, because fees are based upon a percentage of the recovery, courts in this circuit do not find it necessary to scrutinize Class Counsel's lodestar or undertake a review of Class Counsel's billing records. *See, e.g., In re Checking Account Overdraft Litig.,* 2014 WL 11370115 at *15. Accordingly, although the information relating to each firm's hours, rates and expenses are summarized in Mr. Hall's declaration, Class Counsel are not submitting their detailed billing records because the records are not redacted, contain work product, and might reveal information to opposing counsel that would adversely impact Plaintiffs' position if the settlement is not approved. Nonetheless, if this Court wishes to review the records, Class Counsel will immediately provide them. If the Court asks to see their billing records, however, Class Counsel request that the review be done in camera.

to pay to Class Counsel the sum of $100,000 in costs as provided in the settlement. *See, e.g.,*
*Waters,* 190 F.3d at 1298 (recognizing that class counsel entitled to expenses in addition to an
award of fees); *see also (*Tanner Decl. at ¶ 14) ($100,000 in litigation expenses is reasonable).

## V.   The Court Should Approve Service Awards to the Class Representatives.

Courts routinely approve service awards to compensate class representatives for their
time and efforts on behalf of the class and encourage them to serve in a representative capacity.
*See, e.g., Hinson II,* No. 3:13-cv-00029 (Doc. 172) (approving service awards of $15,000
per class representative); *In re Checking Account Overdraft Litig.,* 2014 WL 11370115 at
*12-13 ($10,000 service awards to 12 named plaintiffs); *Spicer v. Chi. Bd. Options*
*Exchange, Inc.,* 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) (collecting cases approving
awards ranging from $5,000 to $100,000, and awarding $10,000 to each named plaintiff).
The five class representatives devoted substantial time to this litigation, meeting with
counsel, sitting for depositions,[14] responding to written discovery, producing numerous
documents, and consulting regarding settlement.  (Hall Decl. at ¶¶ 119-126).  Each of the
Named Plaintiffs refused the opportunity to be made whole for all of the alleged damages.
*Id.* Each of the named Plaintiffs travelled to Daytona, Florida under threat of inclement
weather to actively participate in a full day of mediation. *Id.* Each of the Named Plaintiffs
also agreed to declare impasse on at least two occasions during negotiations over releases
and notice and thus were willing to risk their recovery and delay their payments for the
good of the class. *Id.* But for their efforts, other class  members would be receiving nothing.

---

[14] The service awards sought for Love and Smith are $8,000, instead of $10,000, because they had yet to provide
their deposition when the case settled.

24

*Id.* at ¶ 19.  Accordingly, the service awards should be approved.  *See also* (Tanner Decl. at ¶ 20) (requested service awards are "very reasonable").

## CONCLUSION

For the reasons set forth in this application, Class Counsel request the Court award them fees of $5 million and expenses of $100,000.00, and approve service awards of $10,000 to each of Chantal Bastian, William Laker, and Oliver Sutton, and $8,000 to Terry Smith and Ryann Love.

Plaintiff CHANTAL BASTIAN, et al., on behalf of themselves and all others similarly situated

| | |
|---|---|
| By: /S/ Christopher B. Hall | Tracy L. Markham, Trial Counsel |
| Christopher B. Hall, Trial Counsel | Florida Bar No. 0040126 |
| Hall & Lampros, LLP | Avolio & Hanlon, P.C. |
| 1230 Peachtree Street, NE, Suite 950 | 2800 N 5th Street, Suite 302 |
| Atlanta, GA 30309 | St. Augustine, Florida 32084 |
| Tel. (404) 876-8100 | Tel. (904) 794-7005 |
| Fax (404) 876-3477 | Fax (904) 794-7007 |
| E-mail: chall@hallandlampros.com | E-mail: tlmarkhamlaw@gmail.com |

## CERTIFICATE OF SERVICE

I hereby certify that, on August 19, 2017, a copy of the foregoing was filed electronically, and will be sent by e-mail to all parties by operation of the Court's ECF system.

/S/ Christopher B. Hall
Christopher B. Hall
